

1  **DONALD AMAMGBO**
   **123 OAKPORT, SUITE 4900**
2  **OAKLAND, CA 94621**
   **TELEPHONE: 510 615 6000**
3  **FACSIMILE: : 10 615 6025**

4
   **REGINALD TERRELL**
5  **THE TERRELL LAW GROUP**
   **223 25TH STREET**
6  **RICHMOND 94804**
   **TELEPHONE: 510 237 9700**
7  **FACSIMILE: 510 237 4616**

8
   **Attorneys for Plaintiff**
9

10              UNITED STATES DISTRICT COURT

11          NORTHERN DISTRICT OF CALIFORNIA

12  LISA BLACKWELL, on Behalf of herself    No. **C08-01928**
    and All Others Similarly Situated,
13                                          CIVIL - CLASS ACTION
              Plaintiff,
14                                          JURY TRIAL DEMANDED
        vs.
15
    FIDELITY NATIONAL FINANCIAL,
16  INC., FIDELITY NATIONAL TITLE
    INSURANCE COMPANY, TICOR TITLE
17  INSURANCE COMPANY, TICOR TITLE
    INSURANCE COMPANY OF FLORIDA,
18  CHICAGO TITLE INSURANCE
    COMPANY, NATIONAL TITLE
19  INSURANCE OF NEW YORK, INC.,
    SECURITY UNION TITLE INSURANCE
20  COMPANY, THE FIRST AMERICAN
    CORPORATION, FIRST AMERICAN
21  TITLE INSURANCE COMPANY,
    UNITED GENERAL TITLE INSURANCE
22  COMPANY, LANDAMERICA
    FINANCIAL GROUP, INC.,
23  COMMONWEALTH LAND TITLE
    INSURANCE COMPANY, LAWYERS
24  TITLE INSURANCE CORPORATION,
    TRANSNATION TITLE INSURANCE
25  COMPANY, STEWART TITLE
    GUARANTY COMPANY and STEWART
26  TITLE INSURANCE COMPANY
27
28

                                                              -1-

                          COMPLAINT

1    Defendants

2    Plaintiff Lisa Blackwell, by her attorneys, on behalf of herself and all others similarly

3    situated brings this action for treble damages and injunctive relief under the antitrust laws of the

4    United States and based on statutes of the State of California against the above-named

5    defendants, demand a trial by jury, and complaining and alleging as follows:

6    **I.    INTRODUCTION**

7    1.    From the consumer's point of view, title insurance differs greatly from other, more

8    familiar kinds of insurance.  For one thing, while automobile and homeowner insurance policies

9    protect consumers from an event that may occur in the future, title insurance offers protection

10    from events that might have occurred in the past.

11    2.    Most simply, title insurance is protection purchased against a loss arising from

12    problems that occurred in the past and may affect the title to the real estate that a consumer is

13    buying.  Title insurers do not compete on the basis of the policies or coverage that they provide.

14    In fact, almost all title policies are based on a single set of form policies published and

15    maintained by the national trade association, the American Land Title Association.  Furthermore,

16    the end goal of an exhaustive title search by a title insurer is not to provide coverage for title

17    defects that the search uncovers, but rather to exclude coverage for any such defects and

18    therefore, further reduce the real value of the title policy which is written to cover only unknown

19    defects in title at the time of issuance.  As a result, title insurance is a commodity product.

20    3.    Even for the savviest of insurance consumers, the purchase of a title insurance

21    policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of

22    paperwork and signings that culminate in the closing of a home purchase.  Consumers, who

23    normally show around for their insurance and carefully compare prices, typically emerge from

24    the closing on their new home holding an insurance policy that they know virtually nothing about

25    and that in all likelihood, they will never need.

26    4.    The title insurance market in California consists of a dozen carriers, ranging in

27    size from regional companies to national affiliates.  However, the market is dominated by four

28    groups of affiliated companies which, combined, sell over 90 percent of the title insurance

-2-

1  policies sold in California and which own and control the title plants in many California counties

2  that every title insurer must rely on in order to issue title policies.

3       5.     Title companies, in marked contrast to property, casualty, life and other traditional

4  insurance carriers, choose not to market their products directly to the consumers who pay for

5  them. Instead, the title insurance industry operates on what is termed a "reverse competition"

6  model. Reverse competition means that title companies solicit business referrals from the other

7  major players in the home purchase scenario - real estate agents and agencies, banks, lenders,

8  builders, developers an others: middlemen or go-betweens. The title companies pay middlemen

9  for these referrals in the form of direct payments, advertising expenses, junkets, parties and other

10  kick-backs and inducements. In addition, middlemen such as Windermere, John L. Scott and

11  Caldwell Bank-Bain, who themselves control a significant portion of the real estate brokerage

12  market, take significant ownership stakes in local title agents and affiliates of the major title

13  insurers and thereby get a direct return in profit from the referral of title business to the title agent

14  whom the partly or wholly own.

15       6.     Reverse competition, as the term suggests, isn't a model that benefits consumers

16  through market-driven forces. In fact, consumers are bypassed completely as title companies

17  spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders,

18  builders, developers and others in an effort to convince these middlemen to steer their home-

19  buying clients to their companies for their title insurance needs.

20       7.     In some of the major markets in the United States, these same title insurers

21  collectively meet, and jointly set rates and file these rates with the applicable state insurance

22  authority. The rates are not subject to any meaningful review of regulation. The companies

23  agree to fix the price of title insurance far in excess of the risk and loss experience associated

24  with such insurance. As a result of the joint agreement as to rates, competition is relegated to the

25  middleman. As a result of their joint rate setting and agreement, no company competes on price

26  to the consumer.

27       8.     Having agreed to fix prices in states where joint rate setting occurs, the companies

28  agreed to not compete based on price to the consumer in other states, including California, where

-3-

regulation of filed rates is lax or non-existent.  Thus, they agreed to set rates at supra competitive prices and to compete based on offering inducements to middlemen.  In California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing number" of such inducements that are in violation of state law.  However, the OIC does not actively oversee or regulate rates, and, in fact, does not buy its own admission have the power to do so.  The absence of regulation has allowed collusive behavior and excessive rates.

9.    In addition to paying inducements and kick-backs, the title companies and their agents divide the market of real-estate middlemen through the use of Affiliated Business Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership in favored title insurance affiliates.  The real estate brokers then reward their associates for using the preferred title insurance providers and lock-out independent title insurers.

10.    In this action, plaintiff, on behalf of a class of those purchasing title insurance in California seek damages arising from defendants' violations of the Sherman Act as well as California statutory law.

## II.    JURISDICTION AND VENUE

11.    This Complaint is filed and these proceedings are instituted under Section 4 and 16 of the Act of Congress of October 15, 1914 C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the Class which she represents by reason of defendants' and their co-conspirators' violations, as hereinafter alleged, of Section 1 of the Sherman Act (15 U.S.C. § 1).

12.    Defendants transact business, maintain offices or are found within the Northern District of California.  The interstate commerce described hereinafter is carried on, in part, within the Northern District of California and the conspiratorial acts herein alleged were carried on, in part, in the Northern District of California.

13.    Intra-district Assignment:  Assignment to the San Francisco or Oakland division of this court is appropriate because a substantial part of the events or omission which give rise to

-4-

1  the claim occurred in the county of San Francisco.  Pursuant to Northern District of California,

2  Local Rule 3-2(d), assignment to either the San Francisco Division or the Oakland Division is

3  proper.

### III.  PARTIES

5       14.    Plaintiff Lisa Blackwell, is an individual residing in San Francisco County,

6  California.  During the class period, plaintiff purchased title insurance directly from one or more

7  of the defendants herein and has been injured by reason of the antitrust violations alleged.

8       15.    Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware

9  corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204.  Fidelity

10  National does business in California through one or more of its subsidiaries, including but not

11  limited to defendants Fidelity National Title Insurance Company, Ticor Title Insurance

12  Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York,

13  Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company.  Fidelity

14  National is registered to do business in California.

15       16.    Defendant Fidelity National Title Insurance Company ("FNTIC") is a California

16  Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

17  32204.  FNTIC does business in California, is a licensed title insurance company in California

18  and is registered to do business in California.

19       17.    Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation

20  with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204.  Ticor

21  does business in California, is a licensed title insurance company in California and is registered to

22  do business in California.

23       18.    Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida

24  corporation with its principle place of business 601 Riverside Ave., Jacksonville, Florida 32204.

25  TTICF does business in California, is a licensed title insurance company in California and is

26  registered to do business in California.

27       19.    Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri

28  Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

-5-

1    32204. Chicago Title does business in California, is a licensed title insurance company in

2    California and is registered to do business in California.

3            20.    Defendant National Title Insurance of New York, Inc. ("NYINY") is a New York

4    Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida

5    32204. NYINY does business in California, is a licensed title insurance company in California

6    and is registered to do business in California.

7            21.    Defendant Security Union Title Insurance Company Chicago Title Insurance

8    Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601

9    Riverside Ave., Jacksonville, Florida 32204. Chicago Title does business in California, is a

10   licensed title insurance company in California and is registered to do business in California.

11           22.    The Fidelity family of title insurance companies (collectively, "Fidelity") - which

12   includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NYINY and SUTIC,

13   and their affiliates - in engaged in selling title insurance to purchases of commercial and

14   residential real estate throughout the United States, including California. Nationally, Fidelity

15   accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly

16   $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined

17   below) and since TIRSA's inception have charged title insurance rates in New York that TIRSA

18   collectively sets.

19           23.    The Fidelity family of title insurance companies and their affiliates are wholly-

20   owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries,

21   Fidelity National is a provider of title insurance, specialty insurance, and claims management

22   services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of

23   title insurance companies engaged in the conduct challenged herein with the approval and assent

24   of defendant Fidelity National.

25           24.    Defendant The First American Corporation ("First American") is a California

26   corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First

27   American does business in California through one or more its subsidiaries, including but not

28   limited to, defendant First American Title Insurance Company and United General Title

1 Insurance Company.

2       25.    Defendant First American Title Insurance Company ("FATIC") is a California

3 corporation with its headquarters at 1st American Way, Santa Ana, California 92707.  FATIC

4 does business in California is a licensed title insurance company in California and is registered to

5 do business in California.

6       26.    Defendant United General Title Insurance Company ("UGTIC") is a Colorado

7 corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO 80112.  UGTIC does

8 business in California, is a licensed title insurance company in California and is registered to do

9 business in California.

10       27.    The First American family of title insurance companies (collectively, "First

11 American") - which includes defendants First American, FATIC and UGTIC, and their affiliates

12 - is engaged in selling title insurance to purchasers of commercial and residential real estate

13 throughout the United States, including California.  Nationally, First American accounts for

14 approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion.

15 First American Title was a founding member if TIRSA and since TIRSA's inception has charged

16 title insurance rates in New York that TIRSA collectively sets.

17       28.    The First American family of title insurance companies and their affiliates are

18 wholly-owned and controlled by defendant The First American Corporation.  Through its

19 subsidiaries, First American is a provider of title insurance, business information, and related

20 products and services.  First American had 2006 revenues of roughly $8.5 billion.  The First

21 American family of title insurance companies and their affiliates engaged in the conduct

22 challenged herein with the approval and assent of defendant First American.

23       29.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia

24 corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060.  LandAmerica does

25 business in California through one or more of its subsidiaries, including but not limited to,

26 defendants Commonwealth Land Title Insurance Company, Lawyers Title Insurance Corporation

27 and Trans-nation Title Insurance Company.

28       30.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a

-7-

1  Pennsylvania corporation with its principle place of business at 5600 Cox Road, Glen Allen,

2  Virginia 23060.  CLTIC does business in California, is a licensed title insurance company in

3  California and registered to do business in California.

4       31.    Defendants Lawyers Title Insurance Corporation ("LTIC") is a Nebraska

5  corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

6  LTIC does business in California, is a licensed title insurance company in California and is

7  registered to do business in California.

8       32.    Defendants Trans-nation Title Insurance Corporation ("TNTIC") is a Nebraska

9  corporation with its principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.

10  TNTIC does business in California, is a licensed title insurance company in California and is

11  registered to do business in California.

12       33.    The LandAmerica family of title insurance companies (collectively,

13  "LandAmerica") - which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their

14  affiliates - is engaged in selling title insurance to purchasers of commercial and residential real

15  estate throughout the United States, including California.  Nationally, LandAmerica accounts for

16  approximately 19 percent of title premiums, which in 2006 amount to roughly $3.15 billion.

17  Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's

18  inception have charged title insurance rates in New York that TIRSA collectively sets.

19       34.    The LandAmerica family of title insurance companies and their affiliates are

20  wholly-owned and controlled by defendant Land America Financial Group, Inc.  Through its

21  subsidiaries, LandAmerica is a provider of title insurance and other products and services that

22  facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.

23  LandAmerica had 2006 revenues of roughly $4 billion.  The LandAmerica family of title

24  insurance companies and their affiliates engaged in the conduct challenged herein with the

25  approval of defendant LandAmerica.

26       35.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation

27  headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056.  STGC does business in

28  California, is a licensed title insurance company in California and is registered to do business in

-8-

1    California.

2         36,     Defendant Stewart Title Insurance Company ("STIC") is a New York corporation

3    with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017.  STIC

4    does business in California, is a licensed title insurance company in California and is registered to

5    do business in California.

6         37.     The Stewart family of title insurance companies (collectively, "Steward") - which

7    includes defendants STGC and STIC, and its affiliates - is engaged in selling title insurance to

8    purchasers of commercial and residential real estate throughout the United States and California.

9    Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006

10   amounted to roughly $2 billion.  Stewart was a founding member of TIRSA and since TIRSA's

11   inception has charged title insurance rates in New York that TIRSA collectively sets.

12        38.     Together, defendants account for more than 85 percent of title premiums

13   consumers pay in California.  Nationally, they account for more than 85 percent of title

14   premiums, which in 2006 amounted to roughly $14.5 billion.  Throughout the relevant damages

15   period, defendants charged California consumers in California virtually identical title insurance

16   rates.

17                          IV.    **OTHER ENTITIES**

18        39.     TIRSA is a voluntary association of title insurers licensed as a rate service

19   organization pursuant to Article 23 of the State of New York Insurance Law.  TIRSA maintains

20   its offices in New York City, which until recently were located at the same New York address of

21   Fidelity Title.

22        40.     TIRSA annually compiles from its members statistical data relating to their title

23   insurance premiums, losses and expenses and submits this information in aggregate form to the

24   New York Insurance Department.  TIRSA also prepares and submits the New York Title

25   Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by

26   TIRSA's members.  The Insurance Department has never objected to any of the rates TIRSA has

27   collectively set.  Similarly, the California OIC has not actually held a public hearing or conducted

28   any other review or regulation of the title insurance rates in California for thirty years.

-9-

41.     TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York.  Currently, Fidelity, First American, LandAmerica and Stewart collectively represent 14 of TIRSA's 22 members.  As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

42.     Various other persons, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## V.     CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the Federal Rules of Civil Procedure, on behalf of herself and a class consisting of all persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who purchased directly, from one or more of the defendants and/or their co-conspirators title insurance for residential and commercial property in California during the four year period preceding this lawsuit and who have sustained damages as a result of the conspiracy herein alleged.  The number of potential class members is so numerous that joinder is impracticable.

44.     Plaintiff, as representative of the class, will fairly and adequately protect the interest of the class members.  The interests of plaintiff are coincident with, and not antagonistic to, those of the class members.

45.     Except as to the amount of damages each member of the class has by itself sustained, all other questions of fact and law are common to the class, including but not limited to, the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act (15 U.S.C. §1) and the effects of such violation.

46.     Plaintiff, along with all other members of the Rule (b) (3) class, were injured as a result of paying supra-competitive prices for title insurance in California.  The supra-competitive prices were achieved as a result of defendants' illegal price-fixing activities and market allocation and division.

47.     Members of the class include hundreds of thousands, if not millions, of

-10-

1  consumers. They are so numerous that their joinder would be impracticable.

2      48.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal

3  Rules of Civil Procedure, for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Rule

4  (b) (2) class includes all members of the (b) (3) class, and all consumers who are threatened with

5  injury by the anticompetitive conduct detailed herein.

6      49.    Defendants have acted, continued to act, refused to act and continued to refuse to

7  act on grounds generally applicable to Rule (b) (2) class, thereby making appropriate final

8  injunctive relief with respect to the Rule (b) (2) class as a whole.

9      50.    Members of the Rule (b) (2) class include hundreds of thousands, if not millions,

10  of consumers. They are so numerous that their joinder would be impracticable.

11      51.    Common questions of law and fact exist with respect to all class members and

12  predominate over any questions solely affecting individual class members. Among the questions

13  of law of fact common to the class are the following:

14      • Whether defendants have engaged in the alleged illegal price-fixing activity and

15        market allocation and division.

16      • The duration and scope of defendants' alleged illegal price-fixing and market

17        allocation and division activity.

18      • Whether defendants' alleged illegal price-fixing and market allocation and

19        division has caused higher prices to plaintiffs and other purchasers of title

20        insurance in California.

21      • Whether the Insurance Commissioner has actively supervised defendants' price

22        fixing and market allocation and division.

23      52.    Plaintiff does not have any conflict of interest with other class members.

24  Plaintiff's claims are typical of the claims of the class and they will fairly and adequately reflect

25  the interests of the class. Counsel competent and experienced in federal class action and federal

26  antitrust litigation has been retained to represent the class.

27

28      53.    This action is superior to any other method for the fair and efficient adjudication

-11-

of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such class members to seek redress for damages resulting from defendants' anticompetitive conduct.

54. There will be no extraordinary difficulty in the management of the class action.

## VI. TRADE AND COMMERCE

55. During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

56. During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

57. During the period in suit, class members from locations outside California purchased commercial or residential property and title insurance within California.

58. During the period in suit, the defendants were the major sellers of title insurance in the United States and California. Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

59. The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII. FACTUAL ALLEGATIONS

### A. The Nature of Title Insurance

60. Title insurance is one of most costly items associated with the closing of real estate transaction. In California, rates for title insurance are based on a percentage of the total value of the property being insurance. For residential properties, this price ranged in 2005 from about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000.00 property). For more expensive homes and commercial properties, these prices are significantly higher. This amount spent on title insurance has risen dramatically over the past decade.

-12-

61.     Title insurance serves an important purpose.   It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

62.     Consumers exercise little discretion in choosing the title insurer from which they purchase the insurance.   That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor.   Consequently, for most purchasers, the cost of title insurance is not challenged.   Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction.   By then its too late, consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing the entire transaction.   There is no shopping around.   There is no negotiation of price.

63.     This dynamic basically removes the sale of title insurance from the normal competitive process.   Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints.   The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions.   And, they are certainly in no position to question the price.

64.     The most effective but illegal way for a particular title insurer to get business is to encourage those making the purchasing decisions - the real-estate middlemen - to steer business to that insurer.   The best way to so motivate the middlemen is not through lower prices (that they are not even paying).   Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business services and other financial enticements.   Therefore, it is through higher pricing (which allows for generous inducements and kick-backs), not lower pricing, which provides the best way for title insurers to compete and increase their business.

**B.      Price-Fixing in the Large Markets**

65.     New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA.   There are two principal cost components that go into TIRSA's calculation.   One comprises the risk associated with issuing the

-13-

1  title policy.  The other comprises the "agency commissions" paid to title agents.

2      66.    The risk components cover the risk the title insurer bears for any undiscovered

3  defects in the title.    Unlike property insurance, title insurance carriers with it a very limited risk

4  of loss to the insurer.  That is because title insurance protects against unknown prior events that

5  cause defects in title.  With a proper search and examination of prior ownership records, any such

6  defects can and almost always are readily identified and excluded from the policy's coverage.

7  Consequently, the average claim on a title insurance policy in the United States amounts to only

8  about 5 percent of the total premium collected.  This is very different from property coverage

9  (such as auto and home insurance) - which protects against future occurrences over the insurer

10  has little or no control - where the average claim payout amounts to about 80 percent of the total

11  premium.

12      67.    The "agency commissions" component of the title insurance rate covers payments

13  made to title agents.  Defendants have an ownership or management stake in many of the title

14  agencies to which these payments are made.  A small portion of these payments is for the search

15  and exam of prior ownership records of the property being purchased to identify any liens,

16  encumbrances, burdens, exclusions, or other defects in the title.  The search and exam function

17  does not involve the spreading or underwriting of risk, and title insurers typically outsource this

18  task to title agents.

19      68.    The remainder, and by far the bulk, of the agency commission are comprised of

20  costs unrelated to the issuance of title insurance.  These costs include kickbacks and other

21  financial inducements title insurers provide to title agents and indirectly (through title agents) to

22  the lawyers, brokers, and lenders who, in realty, are the ones deciding which title insurer to use.

23  These payments have nothing to do with the issuance of title insurance and are made by title

24  insurers merely to inflate their revenues and steer business their way.

25      69.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total tile

26  insurance premium is based on the so-called "costs" associated with the payment of agency

27  commissions.  Only 15 percent is based on costs associated with the risk of loss.

28      70.    TIRSA publishes its final calculated title rates in the New York Title Insurance

-14-

1    Rate Manual. These rates are tied to the value of the property being insured. This is so despite

2    the fact that the costs associated with agency commissions are entirely unrelated to the value of

3    the property. Indeed, agency kickbacks and enticements have little to do with producing a

4    particular title policy and provide no value - proportional to property value. The instead depend

5    on the age of the property, the complexity of the ownership history, and the accessibility of prior

6    ownership records.

7         71.    There are other states in which the defendants overly meet and agree to fix the

8    rates for title insurance as part of a formal collective rate setting process.

9    **C.    TIRSA's Formation**

10        72.    Prior to TIRSA, the New York Board of Underwriters ("NYBTU") served as the

11   title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting

12   bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade

13   Commission ("FTC") challenge to the collective rate setting activity of many of these

14   associations. The FTC's challenge culminated in *FTC v. Ticor Title Inc. Co.*, 504 U.S. 621

15   (1992), where the Supreme Court held that to avoid *per se* illegal price fixing, the rate setting

16   activity of these rating bureaus must be actively supervised by the state.

17        73.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC

18   contended that the respective state insurance departments merely rubber-stamped this portion of

19   the collectively fixed rates without any independent review or analysis of their reasonableness or

20   costs justification. The Supreme Court agreed with the FTC that this kind of limited state

21   oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance

22   department has to "exercise sufficient independent judgment and control so that the details of the

23   rates or prices have been established as a product of deliberate state intervention, not simply by

24   agreement among private parties." *Ticor*, 504 U.S. at 634-35.

25        74.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand

26   in *Ticor Title Ins. Co. v. FTC*, 998 F.2D 1129 (3d Cir. 1992), upheld the FTC's finding that the

27   collective rate-setting of certain state rating bureaus was improper because it was not actively

28   supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed

-15-

1  us that a state's rubber stamp is not enough.  Active supervision requires the state regulatory

2  authorities' independent review and approval". *Id.* at 1139.

3      75.    Defendants formulated TIRSA's first rate manual and procedure soon after the

4  Supreme Court's *Ticor* decision.  Through TIRSA, defendants have set up a rate-setting scheme

5  to get around the rigors of state oversight required by *Ticor*.  They have done so by calculating a

6  single rate that comprises both risk and agency commission costs and by outsourcing to title

7  agents the agency commission costs.  In this way, defendants avoid providing the Insurance

8  Department with any detailed breakout or backup for the bulk of the costs that make up their

9  collectively fixed rates.

10      76.    TIRSA merely submits an aggregated figure that is supposed to represent the total

11  agency commission costs.  Embedded within this figure is the vast quantity of dollars that are

12  funneled to and through the title agencies as kickbacks, financial inducements and other costs

13  unrelated to the issuance of title insurance.  Defendants' design in all of this has been to effective

14  "hide" the costs basis for their artificially high and collectively fixed title insurance premiums

15  form the regulatory scrutiny that *Ticor* demands.

16      **D.**    **Lack of Regulatory Supervision and Authority in New York and Other States Including California**

17      77.    There is no provision under the New York Insurance Law for TIRSA to include in

18  its collectively fixed rates kickbacks and other agency commission payments unrelated to the

19  issuance of title insurance.  Indeed, the New York Insurance Department has openly

20  acknowledged that it lacks the authority to review any agency commission payments.  It has

21  likewise recognized that defendants' outsourcing of agency commission costs has prevented it

22  from performing a meaningful review of TIRSA's calculated rates.  This was made clear at a

23  November 2006 public hearing at New York Insurance Department held - the first in 15 years -

24  where it questioned TIRSA and its members on TIRSA's failure to provide the Insurance

25  Department with any backup or detail for agency commissions.

26      78.    At the hearing, the Insurance Department conceded that is could not properly

27  evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed costs

28

-16-

1  information on agency commissions that TIRSA does not provide.

2    79.    The Insurance Department's recognition that it is not properly supervising

3  TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government

4  Accountability Office ("GAO") that the title insurance industry is in need of greater state

5  regulation. The GAO studied the industry conditions of several states, including New York, and

6  concluded that "state regulators have not collected the type of data, *primarily on title agents'*

7  *costs and operations*, needed to analyze premium prices and underlying costs." (Emphasis

8  added.)

9    80.    Unchecked by regulatory review and insulated from competition, defendants have

10  thus been unable to collectively fix title insurance rates at supra competitive levels and ear profits

11  that vastly exceed those contemplated by the Insurance Department or that would have resulted in

12  a free and open competitive market.

13    81.    At the time of TIRSA's formation, the Insurance Department established 5 percent

14  (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance

15  Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its

16  revenue and cost formation, to ensure that this 5 percent profit level is maintained and based on a

17  reasonable premium.  However, without the authority or ability to scrutinize agency commission

18  costs, the Insurance Department has been unable to perform this function.  As a result, defendants

19  (through TIRSA) have been able to set artificially high title premiums and secure title profits far

20  in excess of the 5 percent threshold.

21    82.    Through an independent investigation conducted over the past several years, the

22  New York State Attorney General found that for every dollar of insurance premium defendants

23  collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is

24  paid out of claims.  And, of the roughly 85 cents that supposedly covers agency commissions,

25  only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title

26  policy.  These numbers show that title insurers' collectively fixed rates have resulted in profits

27  that vastly exceed the costs of producing such policies.

28    83.    The New York Attorney General's investigation further revealed that what were

-17-

1  largely driving these numbers were the kickbacks and other financial inducements defendants

2  were funneling to and through title agents to secure more business.  As reported at the New York

3  Insurance Department's 2006 hearing, one title agency's financial statements revealed that it

4  spent more than $1 million of these so-called "agency commissions" on items identified at

5  "Christmas", "automobile expenses", "political contributions", "promotional expenses", and

6  "travel and entertainment".  These expenses are not even remotely related to the issuance of title

7  insurance.

8      84.    The Washington State Insurance Commissioner's October 2006 report found

9  strikingly similarly abuses in Washington.  Violations were pervasive and the Commissioner

10  concluded that consumers were paying too much as a result.

11      85.    All of this "excess money" paid to title agents not only works to steer business to

12  defendants.  It also served to boost defendants' own profits through the inflated revenues they

13  obtain to cover these agency payments and through their ownership or management stake in

14  many of these agencies.

15      86.    Defendants are competitors in the sale of title insurance to consumers throughout

16  the United States.  These title insurers have agreed and engaged in concerted efforts to (i)

17  collectively set and charge uniform and supra competitive rates for title insurance, (ii) include in

18  their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks,

19  and other charges that are unrelated to the issuance of title insurance, and (iv) hide these

20  supposed "costs" from regulatory scrutiny by funneling them to and through title agents over

21  which the government agencies have no ability or authority to regulate.

22      87.    The GAO in its 2007 report entitled "actions Needed to Improve Oversight of the

23  Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of

24  competitions and questions about the reasonableness of prices including:

25      • Consumers find it difficult to shop for title insurance, therefore, they put little

26          pressure on insurers and agents to compete based on price;

27      • Title agents do not market to consumers, who pay for title insurance, but to those

28          in the position to refer consumers to particular title agents, thus creating potential

-18-

conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

88.    The GAO visited several states including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of anti-kickback laws. In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states. On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief. Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified. Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary penalty, and alternative title insurance models. [*Id.* at 41, footnotes omitted.]

**E.    Competition Based on Kickbacks and Inducements But Not Rates**

89.    Having agreed to fix or stabilize prices in New York and other states where thy overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

90.    In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to no compete on rates in other states as well. To compete on rates in other states could and would imperil their ability to maintain the

-19-

1   agreed rate in states like New York.

2       91.    As is the case in New York, a lack of regulatory authority over rates created an

3   environment in which a conspiracy can and did succeed.  No agency was examining why all the

4   rates were virtually identical, and no agency was examining whether the costs associated with

5   these premiums were reasonable.  This is an environment which is conducive to price fixing,

6       92.    In California, there is a lack of regulatory authority and oversight over title

7   insurance companies.  The rates in California are not set as part of a deliberate state intervention

8   and the state does not and cannot meaningfully renew or approve these rates.  The rates at issue

9   in this case went into effect without review.

10  **F.    Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting**

11      93.    In addition to the uniformity of rates, other facts suggest that it is more plausible

12  than not that rates have been set based on an agreement to fix prices.

13      94.    In theory, the chain of title should be documented back to its historic grant of

14  ownership centuries in the past.  Fear about a possible title defect in the distant past is widely

15  used as a justification by title agencies when convincing property buyers to purchase an owner

16  policy in addition to the lender policy, which is mandatory to secure a mortgage.  The title

17  agency, however, saves much time and money when the search is limited to one or two

18  transactions.  They rely on the insurance policy to cover the remote chance of missing an earlier

19  but still-valid claim.  If such a claim is asserted and survives the scrutiny of the title insurance

20  company's legal department, the expected costs of compensation is likely to be less than the sum

21  of added overhead costs of routinely tracing back every chain of title to the earliest registered

22  owner in the distant past.

23      95.    Title insurance industry officials tend to justify the large proportion of the

24  premium retained by the title abstract and settlement agency (from 60 to more than 90 percent)

25  by the alleged high costs of title searching back into the distant past.  If fact, a high proportion of

26  noncommercial properties are searched only through the most recent transaction.  No information

27  is available as to what proportions of claims originate in the distant past.  The industry has never

28

-20-

published pertinent statistics. It would have a marketing incentive to publish these statistics if the risk were significant; that is has not published these statistics indicates that the risk probably is only slightly greater than zero.

96.    Many U.S. homes are being resold three or four times in twenty-five years. At each of these occasions, an abstract of title will be prepared on the basis of a more or less than thorough review of the available title records, inheritance records, family records and records of past or current liens against a property. It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

97.    Title searches have become less labor intensive, especially in large urban counties and cities. More and more of the information is available online. The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions that occurred during the last twenty-five to thirty-five years. The evidence is strong that the title insurance industry has achieved a remarkable high level of loss minimization.

98.    Thus the costs of production have decreased as has the risk of loss yet none of these factors has resulted in price competition at the consumer level.

99.    There is a remarkable absence of rate changes by title insurers over the past five years, despite the declining costs of production, increased number of transactions and increased revenue per transaction. During a period when costs per unit of production declined significantly, underwritten title companies and title insurers maintained excessive rates. The prices charged by title insurers and underwritten title companies were not and are not responsive to the changing costs of production or increasing revenue per transaction at a given set of rates. Again, this is indicia of an agreement not to compete based on price.

100.    As noted, the title companies engage in illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals. These illegal rebates and kickbacks - a consequence of reverse competition - show that title insurance rates are supra competitive and that some portion of the overcharge is passed from the

-21-

underwritten title company or title insurer to the referrer of business.

101.    A lack of competition and the ability to control prices in enhanced by the fact that there were few title insurer entrants over the period from 1995 through 2005 and the number of title insurer groups declined as title insurers acquired other title insurers.    There were few underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled business arrangements whose addition to the market did not result in greater price competition.

102.    Access to title plants can be a barrier to entry, but the large barrier to entry exits due to the established relationships between the entities that can steer the consumer's title and escrow business and the entities who sell title insurance and escrow services.

103.    The title insurance market is highly concentrated - a few title insurers account for the vast majority of title insurance sales - at both the statewide level and at the county level in California. For example, three title insurer groups account for 77.4% of the market at a statewide level. At the county level, each individual market was highly concentrated. The GAO found that First American and Fidelity had a market share of 66 percent. Such a concentration enhances the ability of companies to fix prices.

104.    The agreement not to compete based on price is also evidenced by the fact that no company has marketed its services to consumers, the ultimate purchasers of the product. This is in marked contrast to real insurance, for example, car insurance, where companies compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor" or Allstate's "good hands" or the cute (to some) GEICO gecko promising low prices.

### VIII.   CLAIMS FOR RELIEF

### COUNT I

### Violation of the Sherman Act

105.    Plaintiff incorporates by reference the preceding allegations.

106.    Beginning at least as early as February 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination of conspiracy in unreasonable restraint of the aforesaid interstate trade and

-22-

1  commerce in violation of Section 1 of the Sherman Act.

2      107.    The aforesaid combination and conspiracy has consisted of a continuing

3  agreement, understanding and concert of action among the defendants and their co-conspirators,

4  the substantial terms of which have been:

5          (a)    to fix, raise, maintain and stabilize the price of title insurance throughout

6  California;

7          (b)    to fix, raise, maintain and stabilize the terms and conditions of the sale of

8  title insurance throughout California; and

9          (c)    to allocate and divide the market for title insurance in California.

10     108.    In the absence of proper regulatory authority and oversight, defendants' conduct

11  constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to

12  allocated and divides the title insurance market in California and is *per se* violation of section I of

13  the Sherman Act

14     109.    Defendants' price-fixing, market allocation and division activity has been

15  continuous throughout the relevant damages period and has been renewed and reinforced

16  annually through submissions to the OIC of supposed costs and revenue information and its

17  periodic submissions of rate changes.

18     110.    Through their collective price-fixing, market allocation and division and

19  manipulation of the regulatory process, defendants have harmed competition by charging

20  consumers supra competitive prices for title insurance in California, evidenced in part by the fact

21  that the prices are uniformly higher than compared with the cost of providing the insurance.

22     111.    The aforesaid combination and conspiracy has had the following effects among

23  others:

24          (a)    price competition in the sale of title insurance has been suppressed,

25  restrained and eliminated;

26          (b)    prices for title insurance have been raised, fixed, maintained and stabilized

27  at artificially high and non-competitive levels; and

28          (c)    purchasers of title insurance have been deprived of the benefit of free and

-23-

1   open competition.

2       112.    During the period of the antitrust violation by defendants and their co-

3   conspirators, plaintiff and each member of the class she represents, has purchased title insurance

4   and, by reason of the antitrust violations herein alleged, paid more for such that it would have

5   paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the class

6   she represents, has been injured and damaged in an amount presently undetermined.

7                           **COUNT II**

8           **Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.***

9       113.    Plaintiff incorporates by reference the preceding allegations.

10      114.    Defendants conduct as set forth above is in violation of the Cartwright Act of

11  California (Cal. Bus. and Prof. Code §§ 16720, *et seq.*)

12      115.    As a direct result of defendants' unlawful acts plaintiffs have paid artificially

13  inflated prices for title insurance and have suffered injury to their business and property.

14                          **COUNT III**

15          **(Cal. Bus. and Prof. Code §§ 17200, *et seq.*)**

16      116.    The preceding paragraphs of this Complaint are realigned and incorporated by

17  reference.  Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§

18  17200, *et seq.*, on behalf of herself and the members of the class.

19      117.    Defendants' statements and representations constitute unfair, unlawful and

20  deceptive trade practices in violation of the UCL.

21      118.    All of the wrongful conduct alleged herein occurs and continues to occur in the

22  conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or

23  generalized course of conduct that is repeated in the State of California on hundreds, if not

24  thousands, of occasions daily.

25      119.    Plaintiff has suffered injury in fact and has lost money or property as a result of

26  defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title

27  insurance than she would or should have absent the conduct complained of.

28      120.    Plaintiff requests that this court enter such orders or judgment as may be necessary

-24-

1  to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to

2  restore to any person in interest any money which may have been acquired by means of such

3  unfair competition and to disgorge any profits realized by defendants as a result of its unfair,

4  unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ.

5  Code § 3345, and for such other relief as set forth in the Prayer for Relief.

**COUNT IV**

**UNJUST ENRICHMENT**

8       121.   Plaintiff incorporates by reference the preceding allegations.

9       122.   This Cause of action is pled in the alternative to all claims and/or causes of action

10  at law.

11       123.   Defendant has received a benefit from plaintiff and the class members in the form

12  of the prices plaintiff and the class members paid for defendants' title insurance.

13       124.   Defendants are aware of their receipt of the above-described benefit.

14       125.   Defendants received the above-described benefit to the detriment of plaintiff and

15  each of the other members of the class.

16       126.   Defendants continue to retain the above-described benefit to the detriment of

17  plaintiff and the class members.

18       127.   As a result of defendants' unjust enrichment, plaintiff and the class members have

19  sustained damages in an amount to be determined at trial and seek full disgorgement and

20  restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the

21  unlawful or wrongful conduct alleged above.

**PRAYER FOR RELIEF**

23  **WHEREFORE, plaintiff demands:**

24       A.    That the alleged combination and conspiracy among the defendants and their co-

25  conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of

26  Section 1 of the Sherman Act;

27       B.    That the court declares the premiums charged are excessive under state law and

28  order damages;

-25-

1        C.     That judgment be entered against defendants, jointly and severally, and in favor of

2    plaintiff, and each member of the class it represents, for threefold the damages determined to

3    have been sustained by plaintiff; and each member of the class it represents, together with the

4    cost of suit, including a reasonable attorneys' fee;

5        D.     Each of the defendants, successors, assignees, subsidiaries and transferees, and

6    their respective officers, directors, agents and employees, and all other persons acting or claiming

7    to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from in

8    any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid

9    combination, conspiracy, agreement, understanding or concert of action, adopting or following

10   any practice, plan, program, or design having a similar purpose or effect in restraining

11   competition; and

12       E.     Such other and further relief as may appear necessary and appropriate.

13   **JURY TRIAL DEMANDED**

14       Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged

15   herein.

16

17

18

19

20   Date: April 8, 2008                    Respectfully submitted,

21

22

23   By: _____

24       DONALD AMAMGBO

25       REGINALD TERRELL

    Attorneys for Plaintiffs

26

27

28

-26-

COMPLAINT